IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MANUEL C. SEDILLOS

       Plaintiff,

v.                                                      No. 1:10-cv-01063-WJ/WDS

UNITED COLLECTION BUREAU, INC.,

       Defendant.

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff's Motion must be denied because each of his claims under the Fair Debt Collection Practices Act ("FDCPA") fail as a matter of law.  First, UCB is entitled to a bona fide error defense regarding Plaintiff's claim for an improper disclosure of his debt to a third party under Sections 1692b or 1692c(b) because UCB representative Ruben Vignoli believed that he was speaking with Plaintiff, and not Plaintiff's Father, when he mentioned Plaintiff's debt.  Second, Plaintiff's claim for a violation of Section 1692c(b) for Mr. Vignoli's message for a return call fails because Mr. Vignoli did not convey information regarding Plaintiff's debt besides the disclosure that is covered by the bona fide error defense.  Third, Plaintiff's claim for a violation of Section 1692e based upon Mr. Vignoli's alleged statement that he was calling "from CitiBank" fails because such a "false" statement was immaterial since Citibank had authorized UCB to collect the debt that Plaintiff owed to CitiBank.  At the very least, there is a factual dispute over whether Mr. Vignoli made this statement.  Furthermore, Plaintiff's remaining claim under the New Mexico Unfair Practices Act ("NMUPA") fails because Plaintiff has not alleged or proven that he has suffered a loss of any money or property.

## LEGAL STANDARD

"The inquiry performed [in deciding a summary judgment motion] is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Evidence, including testimony, must be based on more than mere speculation, conjecture**,** or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Cardoso v. Calbone,* 490 F.3d 1194, 1197 (10th Cir. 2007). Courts examine the factual record in the light most favorable to the party opposing summary judgment. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1168-69 (10th Cir. 2010) (citation omitted).

## ADDITIONAL FACTS PURSUANT TO D.N.M.LR-CIV. 56.1(b)

A. Plaintiff's full name is Manuel Carbajal Sedillos. *See* Deposition of Manuel C. Sedillos attached hereto as Exhibit A at 4:7-13.

B. Plaintiff's father's full name is Manuel Amador Sedillos ("Plaintiff's Father"). *See* Deposition of Manuel A. Sedillos attached hereto as Exhibit B at 4:4-6.

C. UCB representative Ruben Vignoli did not initiate the telephone call with Plaintiff's Father that is the subject of this case. Instead, it was a "lady", believed to be UCB representative Patsy Quintana, that initially placed the call to Plaintiff's Father's telephone number. *See* Complaint, Doc. No. 1 at ¶¶ 15-16; Plaintiff's Father's Statement attached hereto as Exhibit C; Plaintiff's Handwritten Notes attached hereto as Exhibit D; Exhibit B at 22:15-23:21.

D. The "lady" that called Plaintiff's Father asked for Manuel C. Sedillos. *See* Exhibit B at 22:15-23:21; Exhibits C & D.

E. Plaintiff's Father was stuttering in response to the "lady," "probably" mixing Spanish with English. Plaintiff's Father did not believe that the "lady" understood anything he was saying. Plaintiff's Father did not tell the "lady" that he was not Manuel C. Sedillos. *See* Exhibit B at 22:15-24:7; Exhibit C; Exhibit D.

F. Plaintiff's Father's call was transferred to UCB representative Ruben Vignoli. The "lady," believed to be Patsy Quintana, and Mr. Vignoli were never on the call at the same time. There is no evidence that Patsy Quintana informed Mr. Vignoli that Plaintiff's Father was on the line before Mr. Vignoli picked up the transferred call. *See* Exhibit B at 22:15-24:18; Exhibits C & D. *See* Deposition of Patsy Quintana attached hereto as Exhibit I at 31:16-32:6.

G. Mr. Vignoli introduced himself to Plaintiff's Father and began by asking "what he was going to do about his $12,000 debt." *See* Complaint, Doc. No. 1 at ¶ 17; Exhibit B at 24:8-22; Exhibits C & D.

H. Plaintiff's Father then told Mr. Vignoli that he was Manuel A. Sedillos. Mr. Vignoli asked if Plaintiff's Father knew Manuel C. Sedillos. At that point, Plaintiff's Father told Mr. Vignoli that Manuel C. Sedillos was his son. Plaintiff's Father believes that Mr. Vignoli thought that he was speaking to Manuel C. Sedillos, the Plaintiff, up until Plaintiff's Father informed Mr. Vignoli that he was Manuel A. Sedillos. *See* Exhibit B at 24:19-25:20; Exhibits C & D.

I. Mr. Vignoli did not know that he was speaking with Plaintiff's Father when he asked him about Plaintiff's debt, but instead believed that he was speaking with Plaintiff. *See* Complaint, Doc. No. 1 at ¶ 17; Exhibits C & D (These exhibits show that Mr. Vignoli phrased the question as if speaking with Plaintiff); Exhibit B at 24:19-25:20; Compliance-Associate Interview Form completed by Ruben Vignoli (the "Interview Form") attached hereto as Exhibit E.

J.   After Plaintiff's Father told Mr. Vignoli that he was Manuel A. Sedillos, and after Plaintiff's father confirmed that he knew Plaintiff Manuel C. Sedillos, Mr. Vignoli asked Plaintiff's Father if he knew if Plaintiff still worked for the Department of Energy.  *See* Exhibit C.

K.   At the time of the alleged call at issue in this case, on or about July 22, 2010, UCB had in place its "CitiBank Collection Manual – United Collection Bureau" (the "Collection Manual"). *See* Affidavit of John Terry attached hereto as Exhibit F; relevant portions of Collection Manual attached hereto as Exhibit G.

L.   At the time of the alleged call at issue in this case, on or about July 22, 2010, UCB had in place its "FDCPA Overview."  *See* Exhibit F; relevant portions of FDCPA Overview attached hereto as Exhibit H.

M.  CitiBank authorized UCB to collect the debt that Plaintiff owed to CitiBank.  *See* Exhibit F.

## RESPONSE TO PLAINTIFF'S ASSERTED FACTS

7.      The "Experian Credit Report" did not "confirm" Plaintiff's address.   The Experian Credit Report included two other addresses for Plaintiff, one address that was later learned to belong to Plaintiff's Father.  *See* Plaintiff's Motion at ¶ 5 & Plaintiff's Exhibit 5.

9.      The Lexis Placement File does not list the "Correct Address" as the only address for Plaintiff under the "Best" tab, as it also lists an address for Plaintiff at 2453 N 15th Rd. Worden, MT 59088.  *See* Plaintiff's Exhibit 4.

11.     The Lexis Placement File did list Plaintiff's Father as a potential relative; however, it also listed Plaintiff as a potential relative.  *See* Plaintiff's Exhibit 4.

17-18.      There is no tangible evidence that UCB representative Patsy Quintana viewed the Front Screen on July 22, 2010.  Ms. Quintana testified that she did not remember any of the events that may have occurred in connection with the account notes for this case.  *See* Exhibit I at 43:5-7; 50:22-51:2; 62:22-23; 93:23-94:25.  There is also no evidence that UCB representative Ruben Vignoli ever viewed the Front Screen before speaking with Plaintiff's Father.

19-20.      There is no tangible evidence that UCB representative Patsy Quintana viewed the XPH Screen on July 22, 2010.  Ms. Quintana testified that she did not remember any of the events that may have occurred in connection with the account notes for this case.  *See* Exhibit I at 43:5-7; 50:22-51:2; 62:22-23; 93:23-94:25.  There is also no evidence that UCB representative Ruben Vignoli ever viewed the XPH Screen before speaking with Plaintiff's Father.

23.      The Accolaid report does not list the "Correct Address" as the only address for Plaintiff under the "Best" tab, as it also lists an address for Plaintiff at 2453 N 15th Rd. Worden, MT 59088.  *See* Plaintiff's Exhibit 10.

24.      UCB representative Colleen Anderson placed the call on July 19, 2010.  Mr. Vignoli did not place this call.  *See* Plaintiff's Exhibit 6 at lines 13-14; Plaintiff's Exhibit 11 at 2.

26.      UCB representative Patsy Quintana placed the call on July 21, 2010.  Mr. Vignoli did not place this call.  *See* Plaintiff's Exhibit 6 at line 24; Plaintiff's Exhibit 11 at 3.

27-28.      There is no tangible evidence that UCB representative Patsy Quintana viewed the Front Screen on July 22, 2010.  *See* Resp. to Assert. Fact. Nos. 17-18.  There is also no evidence that Ruben Vignoli ever viewed the Front Screen before speaking with Plaintiff's Father.

29.      There is no tangible evidence that Ms. Quintana believed that she was calling a relative.  Ms. Quintana testified that she did not remember any of the events that may have

occurred in connection with the account notes for this case.  *See* Exhibit I at 43:5-7; 50:22-51:2; 62:22-23; 93:23-94:25.

30-31, 33.    UCB representative Ruben Vignoli believed that he was speaking with Plaintiff, and not Plaintiff's Father, when he asked about Plaintiff's debt.  *See* Add. Fact. Nos. C-I.

32.    There is a dispute over whether Mr. Vignoli specifically said that he was calling "from Citibank."  When Plaintiff's Father was asked whether it was possible if Mr. Vignoli said that he was calling "for Citibank," Plaintiff's Father replied that he did not know.  *See* Plaintiff's Exhibit 13 at 26:11-13.  Furthermore, Plaintiff's Father testified that Mr. Vignoli did not specifically say that he was an employee of Citibank.  *See id.* at 27:3-5.  At best, Plaintiff's Father is unsure of the exact phrasing that Mr. Vignoli used.

34.    Mr. Vignoli, and not Patsy Quintana, may have left a message with Plaintiff's Father to have Plaintiff call UCB.  *See* Exhibit C & D; Plaintiff's Exhibit 13 at 27:6-20.

35-36.    After Plaintiff's Father told Mr. Vignoli that he was Manuel A. Sedillos, and after Plaintiff's Father confirmed that he knew Plaintiff, Mr. Vignoli asked Plaintiff's Father if he knew if Plaintiff still worked for the Department of Energy.  *See* Exhibit C.

40.    The Collection Manual speaks for itself.  The Collection Manual indicates that UCB may provide its collectors with numbers that may belong to individuals that are not the debtor; however, the Collection Manual certainly does not guarantee that this will be the case in every situation.

41.    The Collection Manual speaks for itself.  The Collection Manual does communicate UCB's policy that its representatives should not believe that a number listed for a relative is a direct contact number for a debtor until it has been informed as such.

42.     The Collection Manual speaks for itself.   UCB maintains the policy that its representatives should confirm such identity information in order to avoid the error of a disclosure based upon a mistaken identity, such as the one that may have occurred in this case.

43-44.     UCB does not have a standard procedure for its representatives to ask the third party to deliver a message to the debtor.  UCB's manuals and trainings only establish the policy that a representative may leave a message with a third party for location information ***when appropriate***.  UCB has explained that the appropriateness of a message is very fact dependent.  UCB discusses this during trainings.  UCB's manuals and trainings expressly prohibit disclosure of any debt information to a third party.  UCB's manuals and trainings never mention that a representative should leave a message with a third party to deliver some other message to a debtor.  *See* Exhibit G at 18; Exhibit H at UCB 00289; Plaintiff's Exhibit 21; Deposition of John Terry (UCB 30(b)(6) designee) attached hereto as Exhibit J at 118:21-119:10; 139:3-15; 140:9-16; Exhibit I at 80:11-18.

45.     Plaintiff does not prove this proposition by citing to Patsy Quintana, one UCB employee that does not even remember every subject of UCB training.  *See* Exhibit I at 97:11-16.  Furthermore, Ms. Quintana testified that UCB trained her to the effect that she was only allowed to tell a third party her name, telephone number, and hours of operation.  *See id*. at 80:11-18.  Therefore, a message to pass along the message to a debtor would have fallen outside of this allowed conduct and would have conflicted with Ms. Quintana's understanding of UCB's training.  Regardless of Ms. Quintana's own personal understanding, UCB's policy on third party contacts is clear as is explained in Resp. to Assert. Facts 43-44 above.

46.     UCB does not have a "practice" to seek assistance from third parties in collecting debts from debtors.  Plaintiff certainly cannot prove this assertion from the testimony of one

representative, who may or may not have some practice of her own which is not allowed by UCB. UCB's policy on third party contacts is clear as is explained in Resp. to Assert. Facts 43-44 above.

47-54.    UCB objects to Plaintiff's Assert. Fact Nos. 47-54 pursuant to Fed. R. Civ. P. 56(c)(2) because these "facts" cannot be presented in a form that would be admissible evidence. *See infra* Section II(D). These complaints speak for themselves as to their allegations.

56.    The entirety of Plaintiff's Complaint is based upon alleged violations by Ruben Vignoli and not Patsy Quintana. *See* Exhibit E.

57-60.    UCB objects to Plaintiff's Assert. Fact Nos. 57-60 pursuant to Fed. R. Civ. P. 56(c)(2) because these "facts" cannot be presented in a form that would be admissible evidence. *See infra* Section II(D). These complaints speak for themselves as to their allegations.

57-58.    UCB conducted a full investigation into the factual allegations of these complaints. To the extent that no "remedial measure" was taken, either UCB's investigation determined that no remedial measure was necessary given the lack of support for the allegations, or the relevant employee was no longer at UCB. *See* Plaintiff's Exhibits 17 & 18.

59.    UCB issued a written warning and suspended a representative in the *Winberry* case for two days. *See* Plaintiff's Exhibit 18.

60-64.    UCB has never had the policy that its representatives should ask third parties to deliver messages to debtors. *See* Resp. to Assert. Fact Nos. 43-46. UCB's training materials and manuals speak for themselves. UCB conducts a thorough investigation of all claims alleged in a lawsuit or administrative complaint. Policies, procedures, trainings, and remedial measures are adopted or modified based upon the outcome of the investigation. Remedial measures were determined to be warranted and taken in approximately eight lawsuits. UCB created "do not

call" programming in response to the *Giffin* case. *See id.* There are approximately forty-five administrative complaints wherein UCB disciplined, retrained, or terminated an employee.

## ARGUMENT

**I.**     **Plaintiff's Claim Under 15 U.S.C. Sections 1692b and/or 1692c(b) For An Improper Disclosure Of His Debt Fails Because The Disclosure Is Subject To A Bona Fide Error Defense.**

Section 1692b of the FDCPA provides that a debt collector shall "not state that a consumer owes any debt" when communicating with a third party for purposes of acquiring location information. 15 U.S.C. § 1692b. Plaintiff claims that UCB violated Section 1692b because Mr. Vignoli asked Plaintiff's Father "what he was going to do about his $12,000 debt." *See* Complaint, Doc. No. 1 at ¶¶ 17, 33. Even if it is assumed for purposes of this Response that Mr. Vignoli asked this question to Plaintiff's Father, which UCB denies, the undisputed facts show that UCB is entitled to a bona fide error defense because Mr. Vignoli believed that he was speaking with Plaintiff, and not with Plaintiff's Father, when he made this statement. *See* Add. Fact. Nos. C-I.

15 U.S.C. Section 1692k(c) provides for a bona fide error defense under the FDCPA's:

> A debt collector may not be held liable in any action brought under this title … if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

"[A]n FDCPA defendant seeking the protection of the bona fide error defense carries the burden of proving that the violation was 1) unintentional, 2) a bona fide error, and 3) made despite the maintenance of procedures reasonably adapted to avoid the error." *Johnson v. Riddle*, 443 F.3d 723, 727-28 (10th Cir. 2006) (citation omitted). In *Riddle*, the Tenth Circuit explained that the "unintentional" prong of this test was a subjective analysis, whereas the "bona fide error" and "procedures" prongs were objective prongs to be established by reasonableness. *Id.* at 728-29.

9

First, Mr. Vignoli's disclosure of the debt amount to Plaintiff's Father was unintentional because Mr. Vignoli believed that he was speaking with Plaintiff, and not Plaintiff's Father, when he asked about Plaintiff's $12,000 debt. *See* Add. Fact Nos. C-I. In *Riddle*, the Court adopted the view that to establish a bona fide error defense, the "debt collector must show that the violation was unintentional, not that the underlying act itself was unintentional." *Riddle*, 443 F.3d at 728.[1] Regardless of whether the intent prong is based upon the underlying act or an intentional violation, Mr. Vignoli's disclosure was unintentional for purposes of this analysis because he factually believed that he was speaking with Plaintiff and therefore did not intend the underlying disclosure or the alleged violation of Section 1692b.

Mr. Vignoli did not make the initial call to Plaintiff's Father. *See* Add. Fact No. C. Plaintiff's Father explained that a "lady" called and asked for "Manuel C. Sedillos." *See* Add. Fact No. D. Plaintiff's Father testified that he does not believe that this "lady" understood any response he had given to her during the call because he was stuttering, "probably" in Spanish and English. *See* Add. Fact No. E. Plaintiff's Father did not tell the "lady" that he was not Manuel C. Sedillos. *See id.* Plaintiff's Father's call was then transferred to Mr. Vignoli. *See* Add. Fact No. F. There is no evidence that this "lady," thought to be UCB representative Patsy Quintana, informed Mr. Vignoli that Plaintiff's Father, and not Plaintiff, was on the telephone line. There also is no evidence that Plaintiff's Father attempted to tell Mr. Vignoli that he was not Manuel C. Sedillos when Mr. Vignoli picked up the line, even though the "lady" that Plaintiff's Father had previously spoken to had asked for Manuel C. Sedillos. *See* Add. Fact Nos. F-H.

---

[1] It is unclear whether this holding was overruled by the United States Supreme Court in *Jerman v. Carlise, McNellie, Rini, Kramer & Ulrich LPA*, __ U.S. __, 130 S. Ct. 1605 (2010). In *Jerman*, the Supreme Court held that "the bona fide error defense in § 1692k(c) does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute." *Id.* at 1624.

Plaintiff's Father explained that Mr. Vignoli introduced himself and then began by asking "what **he** was going to do about **his** $12,000 debt." *See* Add. Fact No. G (emphasis added). Plaintiff's Father told him that his name was Manuel A. Sedillos. *See* Add. Fact No. H. Mr. Vignoli then asked Plaintiff's Father if he knew a Manuel C. Sedillos. *See id*. At that point, Plaintiff's Father told Mr. Vignoli that Manuel C. Sedillos was his son. *See id*. Plaintiff's Father believes that Mr. Vignoli thought that he was speaking to Manuel C. Sedillos, the Plaintiff, up until Plaintiff's Father informed Mr. Vignoli that he was Manuel A. Sedillos. *See id.* Mr. Vignoli did not know that he was speaking with Plaintiff's Father when he asked him about Plaintiff's debt, but instead believed that he was speaking with Plaintiff. *See* Add. Fact No. I. Mr. Vignoli explained within the Interview Form regarding the call with Plaintiff's Father that he "felt like [he] was deceived, father [was] trying to misrepresent himself by passing as son who has same name." *See* Add. Fact No. I; Exhibit E. Mr. Vignoli also explained that "Father with same name identified himself as debtor then after verify[ing] reason of call claims was not debtor but father …." *See id*. Accordingly, the undisputed facts show that Mr. Vignoli did not intend to disclose information about Plaintiff's debt to Plaintiff's Father because Mr. Vignoli believed that he was speaking with Plaintiff.

Second, as to the "bona fide" prong of the bona fide error defense, the *Riddle* court explained that "'in effect, the [bona fide] component serves to impose an objective standard of reasonableness upon the asserted unintentional violation.'" *Riddle*, 443 F.3d at 729. As the facts above show, Mr. Vignoli's error was reasonable for four reasons: 1) Mr. Vignoli did not initiate the call to Plaintiff's Father and therefore did not know which number had been dialed; 2) There is no evidence that Ms. Quintana informed Mr. Vignoli that Plaintiff's Father, and not Plaintiff, was on the line; 3) Plaintiff's Father did not tell Mr. Vignoli that he was Manuel A. Sedillos until

11

after Mr. Vignoli had introduced himself and asked about Plaintiff's debt; and 4) Plaintiff's Father and Plaintiff are both named Manuel Sedillos.  *See* Add. Fact Nos. A-I.  Under these circumstances, it was reasonable for Mr. Vignoli, who had not initiated the call or otherwise been informed that Plaintiff's Father was on the line, to the make the mistake of believing that he was speaking with Plaintiff.  *See id*.

Third, regarding the "procedures prong," the procedures in place by the debt collector must "by the express language of the statute, … be 'reasonably adapted to avoid' the error that occurred."  *Riddle*, 443 F.3d at 729.  As Plaintiff himself has pointed out within his Motion, UCB had trainings and procedures in place at the time of the alleged call which were adapted to avoid identity error and third party disclosure.  *See* Add. Fact Nos. K-L; Exhibits G & H.  At the time of the alleged call, UCB had in place the Collection Manual which provides a copy of the FDCPA and specific instructions regarding the verification of identity, including the confirmation of the caller's full name with middle initial, last four digits of the caller's social security number, and the caller's address.  *See* Exhibit G at 10.  The UCB Manual specifically warns representatives when giving these confirmation instructions that:

> There may be times when the person on the phone may have the same name as the debtor you are looking for, but is not.  For example, you may be speaking with a son or daughter of the debtor who shares the debtor's name, or an unrelated third party acting as the debtor.  By confirming additional information, beyond one's name, you can better ensure you are speaking with the correct individual.

*See id*.  The UCB Manual also provides that representatives are "not to state that the debtor owes a debt" when speaking with a third party for location information.  *See id*. at 18.  UCB additionally provides its collection representatives with "UCB's FDCPA Overview," which again provides a copy of the FDCPA and also informs representatives that they were "not to state

that the debtor owes a debt" when speaking with a third party for location information.  *See*

Exhibit H at UCB 00289.

Mr. Vignoli disclosed Plaintiff's debt to Plaintiff's Father unintentionally because he

believed that he was speaking with Plaintiff.  The circumstances surrounding the transferred call

show that this unintentional error was reasonable.  UCB had in place policies and training

materials which were adapted to avoid this error because such materials had specific instructions

regarding identity verification and avoidance of third party disclosure.  Accordingly, the Court

should find that UCB is entitled to a bona fide error defense pursuant to Section 1692k(c)

regarding Plaintiff's claim for improper disclosure.

**II.**      **Plaintiff's Claim That Mr. Vignoli's Message For A Return Call Violated 15 U.S.C. Section 1692c(b) Fails Because The Message Did Not Convey Debt Information Besides The Disclosure Covered By A Bona Fide Error.**

**A.**      **The FDCPA Requires That UCB's Message Or Contact Constituted A "Communication" That "Conveyed Information Regarding The Debt" In Order To Show A Violation Of Section 1692c(b).**

Plaintiff's Motion focuses much of its energy on his claim that UCB violated 15 U.S.C.

Sections 1692b and/or 1692c(b) because Mr. Vignoli had left a message with Plaintiff's Father

for a return call from Plaintiff.  *See* Complaint, Doc. No. 1 at ¶¶ 22-23.  Specifically, Plaintiff

claims that Mr. Vignoli left his telephone number and asked Plaintiff's Father to tell Plaintiff to

return the call.  *See id*.  Besides the allegation that Mr. Vignoli asked Plaintiff's Father what he

was going to do about his debt, Plaintiff does not allege that Mr. Vignoli mentioned any further

information about Plaintiff's debt.

Section 1692c(b) provides that:

> ***Except as provided in section 804 [15 USCS § 1692b]***, without the prior consent
> of the consumer given directly to the debt collector, or the express permission of a
> court of competent jurisdiction, or as reasonably necessary to effectuate a
> postjudgment judicial remedy, a debt collector may not ***communicate***, ***in***

13

> **connection with the collection of any debt**, with any person other than the
> consumer, his attorney, a consumer reporting agency if otherwise permitted by
> law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

(Emphasis added).  The exception noted in the opening line of Section 1692c(b) relates to

Section 1692b's allowance for the acquisition of location information from third parties.

Plaintiff appears to claim that both sections were violated by the message because the

"communication" violated 1692c(b) and was not otherwise authorized by 1692b.  The analysis

should however be framed as: 1) Did UCB violate 1692c(b); if so, then 2) Was the

"communication" otherwise allowed by 1692b?  Plaintiff's claim fails on the first point because

the alleged message for a return call was not a "communication" that violated 1692c(b).

In order for a debt collector to have violated Section 1692c(b), the debt collector must

have "communicate[d]" with a third party "in connection with the collection of any debt."  §

1692c(b).  The FDCPA definitions section provides that the "term 'communication' means the

**conveying of information regarding a debt** directly or indirectly to any person through any

medium." § 1692a(2) (Emphasis added).  Therefore, in order to prove a violation of Section

1692c(b), Plaintiff must prove that Mr. Vignoli conveyed information regarding Plaintiff's debt.

> **B.**     **Courts Have Held That A Message With A Third Party Does Not Violate
>          Section 1692c(b), Or Otherwise Constitute A "Communication," Unless
>          Information Regarding The Debt Is Disclosed.**

In *Zamos v. Asset Acceptance, LLC*, the debt collector left a message with a

representative of the debtor's former landlord that informed the third party that the collector

worked for Asset Acceptance and that he was a debt collector.  *Zamos v. Asset Acceptance, LLC*,

423 F. Supp. 2d 777, 782 (N.D. Ohio 2006).  The court held that this message did not violate

Section 1692c(b) because the message did not "convey information relating to [the debtor's] debt

liability in violation of the FDCPA."  *Id.*  In *Horkey v. J.V.D.B. & Assoc., Inc.*, the debt collector

called the debtor's assistant and said to "tell [debtor] to quit being such a fucking bitch and then hung up." *Horkey v. J.V.D.B. & Assoc., Inc.*, 179 F. Supp. 2d 861, 867-68 (N.D. Ill. 2002). The court similarly held that this message did not violate 1692c(b) because although the collector used inappropriate language, he did not refer in some way to the debtor's debt. *Id*. In *Briggs v. Credit Collection, Inc.*, the debt collector had left two voice-mail messages that "'convey[ed]' no 'information regarding a debt.'" *Briggs v. Credit Collection, Inc.*, 2007 U.S. Dist. LEXIS 84793, * 12-14 (W. Okla. 2007). The court held that "[t]he statutory definition [of a "communication"] does not include messages or communications that do not impart (or are not a least intended to impart) information about a debt." *Id*. at 13, n. 3. These holdings best apply Section 1692c(b) because they acknowledge its explicit requirement that a violation must be based upon a "communication." The FDCPA's own definition of a "communication" requires that the contact or message "convey[] … information regarding the debt…." § 1692a(2).

Plaintiff does claim that Mr. Vignoli disclosed the amount of his debt to Plaintiff's Father at the beginning of the transferred call. However, as was explained extensively above, this disclosure was the result of a bona fide error. Again, Section 1692k(c) provides that UCB "may not be held liable in ***any action*** brought under" the FDCPA if UCB proves that the "the violation" was a bona fide error. The only portion of the telephone call that would have made the message a "communication" under 1692(a)(2) was an unintentional bona fide error. The Court should therefore find that the message for a return call was not a "communication" as required by Section 1692c(b) and deny Plaintiff's Motion on this claim.

### i) *The "Faulkner Letter" does not provide an "unequivocal" position on this issue by the Federal Trade Commission.*

Plaintiff attaches what he has referred to as the "Faulkner Letter" in support of his assertion that the Federal Trade Commission has stated its "unequivocal" position in his favor.

*See* Plaintiff's Motion at 13, Exhibit 28.  Strangely however, the Faulkner Letter explains that the views that it expresses "are informal in nature and do not necessarily reflect the views of the Commission.  Accordingly, the views expressed herein are not binding on the Commission."  *See* Plaintiff's Exhibit 28 at 2.  By the very terms of the Faulkner Letter, the views expressed are not the views of the Commission.  Indeed, they are "informal" and "not binding."  Accordingly, the Plaintiff's assertion that the Federal Trade Commission has somehow expressed an "unequivocal" view on this issue is misleading and incorrect.

> ii)     ***The Senate report contemplates a "disclosure" of debt information.***

Plaintiff's own citation to the Senate report supports the holding that a violation of 1692c(b) requires a disclosure of information regarding the debt as it states that the FDCPA "prohibits disclosing the consumer's personal affairs."  *See* Plaintiff's Motion at 14 (citing S. Rep. No. 382, 95th Cong., 1st Sess. 4, at 4).  Only "[s]uch contacts are not legitimate collection practices, and result in serious invasions of privacy, as well as loss of jobs."  *See id.*

> iii)    ***The Court should not follow the cases cited by Plaintiff because they ignore the FDCPA's explicit definition of a "communication."***

Plaintiff cites to other courts within his Motion which have held that the act of leaving a message with a third party violates Section 1692c(b) regardless of whether the collector conveyed information regarding the debt.  *See* Plaintiff's Motion at 15-18.  The Court should decline to follow these holdings because such courts have blatantly ignored the fact that Congress: 1) provided that a contact or message can only violate Section 1692c(b) if it is a "communication;" and 2) explicitly defined a "communication" as a contact which "convey[s] … information regarding the debt…."  §§ 1692a(2), c(b).  The United States Supreme Court has made the first and most important rule of statutory construction clear to all courts:

> "… [I]n interpreting a statute a court should always turn first to one, cardinal canon [of statutory construction] before all others. We have stated time and again that courts must

16

> presume that a legislature says in a statute what it means and means in a statute what it says there. … When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations omitted).  There is nothing ambiguous about Congress' requirement that a violation of 1692c(b) must be based upon a "communication."   There is also nothing ambiguous about Congress' definition of a "communication" under the FDCPA as requiring that the collector conveyed information regarding the debt.  *See* § 1692a(2).  The Courts cited by Plaintiff have disregarded this lack of ambiguity, along with the "cardinal rule" of statutory construction, and have instead taken it upon themselves to decide what the FDCPA should say and require.  The Court should refuse Plaintiff's invitation to follow these courts down this improper course and should instead follow the courts in the *Zamos*, *Horkey*, and *Briggs* cases noted above which enforced the FDCPA's explicit requirement that a violation of Section 1692c(b) must be based upon a contact that conveyed information regarding the debt.  Again, since Mr. Vignoli's disclosure of Plaintiff's debt to Plaintiff's Father is covered by a bona fide error defense, the Court should deny Plaintiff's Motion as to this claim.

### C.   Plaintiff's Arguments Regarding Location Information Ignore The Circumstances Of The Telephone Call.

In support of his claim under Section 1692c(b), Plaintiff poses the theory that UCB never intended to obtain location information.  Regardless of whether UCB representatives asked for location information, Plaintiff's claim under Section 1692c(b) fails because the only disclosure of debt information that occurred was covered by the bona fide error defense.  However, it should still be noted that Plaintiff's allegation that location information was not requested: 1) ignores the circumstances of the phone call; and 2) is factually incorrect.  First, Plaintiff's attempt to create an air of suspicion ignores the circumstances of the call.  Ms. Quintana could

not ask Plaintiff's Father any questions about location information because she could not even understand Plaintiff's Father's initial response.  *See* Add. Fact Nos. C-F.  When the call was transferred to Mr. Vignoli, he did not begin by seeking to obtain location information because he believed that he was speaking with Plaintiff, and not Plaintiff's Father.  *See* Add. Fact Nos. G-I.

Second, Plaintiff's allegation is not even correct.  After Plaintiff's Father revealed that he was not Plaintiff, Mr. Vignoli asked Plaintiff's Father if he knew if Plaintiff still worked for the Department of Energy.  *See* Add. Fact No. J.  Therefore, location information was requested.  There was no "pretense" involved with the call regarding the information that UCB had already received.  As was noted above in response to Plaintiff's Asserted Facts, UCB received multiple addresses for Plaintiff.  *See* Resp. to Assert. Fact Nos. 9 & 23.  UCB was entitled to confirm such information as well as gain information regarding other locations in which to reach Plaintiff.  This included information on his current employer, which Mr. Vignoli did seek to confirm.  Accordingly, the Court should not give credence to Plaintiff's posed conspiracy theory.

### D.    UCB Did Not Intentionally Violate Sections 1692c(b) or 1692b.

As has been extensively explained above, UCB did not intentionally violate Sections 1692c(b) or 1692b because Mr. Vignoli believed that he was speaking with Plaintiff, and not Plaintiff's Father, when he allegedly disclosed Plaintiff's debt.  *See* Add. Fact Nos. C-I.  Regardless of what contact information UCB may have had for Plaintiff, Mr. Vignoli did not have actual knowledge that he was speaking to Plaintiff's Father when he picked up the transferred call.  *See id.*  To the extent that Mr. Vignoli left a message for a return call, which UCB denies, UCB has also extensively explained that it does not have a policy for its collectors to leave a message with a third party to have the debtor return the call.  *See* Resp. to Assert. Fact

Nos. 43-46, 64.  Accordingly, UCB should not be held to have intentionally violated Sections 1692c(b) or 1692b in any respect.

The Court should further refuse to consider Plaintiff's improper attempt to use prior complaints to somehow prove that UCB violated the FDCPA in this case because such "evidence" would not be admissible for the claims involved in Plaintiff's Motion.  *See* Fed. R. Civ. P. 56(c)(2).  Indeed, the only reason that Plaintiff was able to discover such prior complaints was because he argued that such information was relevant to his claim for punitive damages.  *See* Doc. No. 28 at 3.  Plaintiff's claim for punitive damages is restricted to his claim under New Mexico's tortious debt collection doctrine, which is not at issue in Plaintiff's Motion.  *See* Plaintiff's Complaint, Doc. No. 1 at Request for Relief ¶ B.

Furthermore, such unadjudicated complaints would be inadmissible under Fed. R. Evid. 403 and 404.  First, Plaintiff's use of these unadjudicated complaints would be inadmissible under Rule 403 because their minimal probative value would be outweighed by the confusion it would cause the jury and the undue prejudice it would cause UCB.  "'The danger of 'confusion of the issues' and 'misleading the jury' arises when circumstantial evidence would tend to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case."  *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998) (citation omitted).  The *McVeigh* court noted the "classic explanation" of this danger: "The notion here is that, in attempting to dispute or explain away the evidence thus offered, new issues will arise as to the occurrence of the instances and the similarity of conditions, [and] new witnesses will be needed whose cross examination and impeachment may lead to further issues."  *Id.* (*citing* John Henry Wigmore, *Evidence,* § 443 at 528-29 (James H. Chadbourn rev., 1979)).  Plaintiff's attempt to bring up twenty-seven unadjudicated lawsuits and over 312 "regulatory

complaints" would require UCB to put on a defense for over 330 cases within this case, which would undoubtedly confuse and mislead the jury.   Plaintiff's attempt to present over 330 **unadjudicated** complaints would also cause an undue prejudice to UCB because such allegations would create the air of suspicion without any proof that such allegations were true, or even substantiated.   Since such complaints are unadjudicated, they would have no probative value.

Second, Plaintiff's use of these "prior wrongs" is improper under Rule 404(b) because he is blatantly trying to show that UCB acted in "conformity" with the allegations of such complaints in this case.   Rule 404(b).   These "prior wrongs" cannot even be said to have been real acts since they are merely unadjudicated allegations contained within complaints.   Notably, Plaintiff is not presenting evidence of the acts which made up such complaints, but is merely presenting the allegations themselves.

### III.   Plaintiff's Claim For A Violation Of 15 U.S.C. Section 1692e Fails Because UCB Was Authorized To Collect The Debt That Plaintiff Owed To CitiBank.

Plaintiff claims that UCB violated 15 U.S.C. Section 1692e(10) because Mr. Vignoli allegedly told Plaintiff's Father that he was calling "from Citibank."   *See* Complaint, Doc. No. 1 at ¶ 21.   Section 1692e(10) prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."   Fundamentally, there is a factual dispute over whether Mr. Vignoli made this statement.   *See* Resp. to Assert. Fact No. 32.   However, even if this allegation were true, which UCB denies, such a "false" statement could not establish a violation of Section 1692e(10) because it was not a material deception that could have confused or mislead Plaintiff or Plaintiff's Father regarding Plaintiff's debt.   Indeed, CitiBank had authorized UCB to collect the debt that Plaintiff owed to CitiBank.   *See* Add. Fact. No. M.

Materiality is a requirement for proving a violation under Section 1692e. *See Donohue v. Quick Collect*, 592 F.3d 1027, 1033 (9th Cir. 2010) ("We now conclude that false but non-material representations are not likely to mislead the least sophisticated consumer and therefore are not actionable under §§ 1692e or 1692f."); *Miller v. Javitch, Block and Rathbone*, 561 F.3d 588, 596 (6th Cir. 2009); *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757 (7th Cir. 2009) ("Materiality is an ordinary element of any federal claim based on a false or misleading statement. … We do not see any reason why materiality should not equally be required in an action based on §1692e. … A statement cannot mislead unless it is material, so a false but non-material statement is not actionable."); *D'Avanzo v. Global Credit & Collection Corp.*, 2011 U.S. Dist. LEXIS 63823, * 11-15 (D. Colo. 2011) (Holding that "materiality" must be considered under a Section 1692e analysis.) (citing *Maynard v. Bryan W. Cannon, P.C.*, 401 Fed. Appx. 389 (10th Cir. 2010) (citations omitted).

In *Campuzano-Burgos v. Midland Credit Mgt.*, the signatures of two executive officers of the debt collection company appeared on the bottom of settlement letters sent out by the company. *Campuzano-Burgos v. Midland Credit Mgt.*, 550 F.3d 294, 296-97 (3rd Cir. 2008). The executive officers authorized the mailings on a broad scale across the company, but did not write or sign the specific letters in the case. *Id*. at 297. The executive officers did not have any knowledge of the company's efforts to collect the plaintiffs' debts, the amounts of the plaintiffs' debts, or that the letters were sent to the plaintiffs. *Id*. Indeed, the executive officers did not personally direct anyone at the collection company to send the letters to the plaintiffs. *Id*. The trial court held that "the use of top executives of the company as signatories is likely meant to impress upon debtors the seriousness of the communication and will almost certainly have such an effect on at least some debtors. … Because [the executives] in this case had no 'actual

21

involvement in the decision to send the letter[s] to a particular debtor . . . the letters . . . are deceptive and misleading within the meaning of Section 1692e.'" *Id*. at 298.

The Third Circuit reversed, reasoning in part that it was "immaterial that [the executive officers] did not personally write or authorize their staff to send the specific letters to plaintiffs. [The company] had authorized and approved the communications whose appearance and content reveal no personal efforts by the executives." *Id*. at 301.  The Third Circuit noted that the plaintiffs' had not alleged that the letters were "otherwise untruthful," "incorrectly listed the amount of debt owed," or "made false statements about the debts' enforceability…." *Id*.  The Third Circuit explained that the "misrepresentation" was not to be judged by the "closer scrutiny" administered when the defendant misrepresents itself to be an attorney. *Id*.

The case at hand is analogous to *Campuzano* in these three aspects.  First, it is "immaterial" that Mr. Vignoli did not actually work at CitiBank because CitiBank had authorized UCB to collect the debt that Plaintiff owed to CitiBank.  *See* Add. Fact No. M. Therefore, there was no meaningful or "material" deception regarding Plaintiff's debt.  Second, Plaintiff does not claim that Mr. Vignoli made any false statements about the debt owed or its enforceability.  Third, it is important that Mr. Vignoli did not claim to have been an attorney as this is the primary identity misrepresentation that is looked at with "closer scrutiny" by the courts.  Similar to the collection company in *Campuzano*, UCB did not violate Section 1692e under these allegations.  Accordingly, this Court should deny Plaintiff's Motion on this claim.

**IV.**   **Plaintiff's Claim Under The NMUPA Fails Because Plaintiff Has Not Suffered The Loss Of Any Money Or Property.**

On August 17, 2011, this Court granted UCB's Motion for Partial Dismissal which dismissed Plaintiff's claim for injunctive relief and the vast majority of his claim under the NMUPA.  *See* Doc. No. 69.  Plaintiff's remaining claim that Mr. Vignoli "falsely" claimed to

have called "from CitiBank" must fail because Plaintiff has not shown that he has lost any
money or property as a result of this alleged deception.   NMSA Section 57-12-10(B) provides:

> Any person who suffers any loss of **money or property**, real or personal, as a
> result of any employment by another person of a method, act or practice declared
> unlawful by the Unfair Practices Act … may bring an action to recover actual
> damages or the sum of one hundred dollars ($ 100), whichever is greater.

(Emphasis added); *Page & Wirtz Constr. Co. v. Solomon*, 110 N.M. 206, 211-12, 794 P.2d 349,
354-55 (1990) ("[R]ecovery of damages under paragraph (B) includes only those persons 'who
suffer any loss of money or property.' The paragraph authorizes recovery of 'actual damages' or
the sum of one hundred dollars, whichever is greater.   ***However, in either case the aggrieved
party must produce evidence of 'loss of money or property' as a result of the practice.***")
(emphasis added); *see also Obenauf v. Frontier Fin. Grp., Inc.*, 785 F. Supp. 2d 1188, 1224
(D.N.M. 2011) ("Emotional distress damages are not available under the NMUPA.").   Notably,
Plaintiff has not even claimed a loss of money or property under his NMUPA claim.   Plaintiff
has claimed the non-economic damages of embarrassment, humiliation, aggravation, frustration,
inconvenience, lost time, and lost privacy.   *See* Complaint, Doc. No. 1 at ¶ 31.   Within the
"Request for Relief" section of Plaintiff's complaint, Plaintiff only requested relief for actual
damages under his FDCPA and tortious debt collection claims, and not under the NMUPA.
Instead, Plaintiff only claimed an injunction under the NMUPA, which did not require a loss of
money or property.   As was mentioned above, this injunctive relief was dismissed by this Court.
*See* Doc. No. 69.

Even if a claim for the loss of money or property can be gleaned from such ambiguous
assertions, Plaintiff did not prove such damages.   Plaintiff's Initial Disclosures did not provide a
tangible measure for any damages, but instead stated: "[a]ctual damages in an amount to be set
by the jury."   *See* Plaintiff's Initial Disclosures, attached as Exhibit K at 3.   Furthermore, this

Court recognized in its Order on UCB's First Motion to Compel, which requested the production of any documents that may prove damages in this case, that the "Court reads Plaintiff's response as saying it has no specific documents beyond those identified as proving liability, thus he has nothing more to produce." *See* Doc. No. 102.  Plaintiff has not supplemented his Initial Disclosures or responses to discovery requests to produce any documentation to support a loss of money or property.  Since Plaintiff has neither claimed nor proven a tangible loss of money or property, the Court should deny Plaintiff's Motion on this claim.

## CONCLUSION

For the foregoing reasons, UCB requests that the Court deny Plaintiff's Motion.

Respectfully submitted,

MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.

By: */s/ Zachary R. Cormier*
     Jennifer G. Anderson
     Zachary R. Cormier
     Post Office Box 2168
     Albuquerque, New Mexico  87103-2168
     Telephone: 505.848.1800
     jga@modrall.com; zrc@modrall.com

WE HEREBY CERTIFY that on December 5, 2011, the foregoing brief was filed electronically through the CM-ECF system, which caused the following to be served by electronic means:

Richard N.  Feferman, Esq.
Charles Parnall, Esq.
300 Central Ave. S.W., Suite 2000 West
Albuquerque NM  87102

MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.

By: */s/ Zachary R. Cormier*
     Zachary R. Cormier

Y:\dox\client\84768\0001\PLEADING\W1598429.DOCX